John Robinson, Lead Counsel #6-2828
**Jamieson and Robinson, LLC**
185 W. Broadway Ste, 101
P.O. Box 4285
Jackson, Wyoming  83001
Telephone 307-733-7703
robinsn@vcn.com

Elisa G. Massoth, ISB NO. 5647, Co-Counsel
**ELISA G. MASSOTH, PLLC.**
14 S. Main Street, Suite 200
P. O. Box 1003
Payette, Idaho   83661
Telephone 208-642-3797
emassoth@kmrs.net

Timothy W. Miller, # 5-2704
**Miller Law Office**
119 S. Washington St.
Casper, Wyoming  82602
Telephone 307-472-3060
twm@mlocasper.com

Attorneys for Plaintiff

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF IDAHO, SOUTHERN DIVISION

| | |
|---|---|
| WILLIAM A. BOWN,<br><br>       Plaintiff,<br><br>v.<br><br>BRENT D. REINKE; RONA SIEGERT; RANDY E. BLADES; JIMMIE H. CROSBY; DANIEL METTIE; BECKY A. BLAKE; RONALD D. PIXLER; TIMOTHY J. RICHARDSON; CORIZON, INC., fka CORRECTIONAL MEDICAL SERVICES, INC., a Missouri corporation; KAREN B. BARRETT, PA; APRIL DAWSON, MD; CASSIE RICHINS, LPN; and JOHN and JANE DOES 1-10,<br><br>       Defendants. | Case No  12-CV-00262-BLW<br><br>**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

**COMES NOW** Plaintiff, by and through his counsel of record, and hereby submits his Memorandum in Opposition to Defendants' Motion for Summary Judgment, as follows:

## I.  PRELIMINARY STATEMENT

On February 19, 2011, plaintiff William Bown, an inmate at the Idaho Maximum Security Institution ("IMSI"), presented to the prison infirmary with the "classic symptoms" of a heart attack. (*See* Statement of Material Facts at ¶¶ 1-4, 6). By 2:20 p.m., a prison LPN (Cassie Richins) had in her hands an EKG that confirmed Bown was having a heart attack and needed immediate hospitalization. (*Id.* at ¶ 5). Trouble is, no one qualified to interpret the EKG was around. (*Id.* at ¶¶ 6, 10).

The PA on call, Karen Barrett, says she would have ordered immediate transport if she had looked at the EKG. (*Id.* at ¶ 7). But she did not look at it or arrange for anyone else to do so. (*Id.* at ¶¶ 7-8). So Bown was kept at the prison. (*Id.* at ¶ 6). Several hours went by. (*Id.*). Heart muscle died. (*Id.* at ¶ 15). Finally, a (halfway) qualified person looked at the EKG and told Barrett that Bown was in trouble. (*Id.* at ¶ 9). Bown was taken to the hospital; according to the treating physician, it was obvious Bown was having a heart attack. (*Id.* at ¶ 1 n. 1).

The IMSI medical system was set up for this failure. In addition to there being no one qualified person to read the EKG on site, IMSI had no means of transmitting the EKG to a qualified person.[1] (*See* Statement of Material Facts at ¶¶ 11, 12). And IMSI only had one PA on call, Barrett, who was responsible for numerous facilities and 5,700 inmates. (*Id.* at ¶ 12). Barrett was very busy with calls from all over the state and lost track of time. (*Id.*).

Defendants have moved for summary judgment. As discussed below, the court should grant plaintiff's motion to stay the summary judgment motion pending court-ordered discovery and

---

[1] Of course, Barrett could have gone to the prison to read the EKG. Barrett could also have had Bown taken to the hospital where it could be read.

additional depositions. Further, contrary to defendant's argument, there is already a genuine dispute of material fact as to whether Barrett violated plaintiff's Eighth Amendment rights. Summary judgment should not be granted.[2]

## II. STATEMENT OF MATERIAL FACTS

1.    Plaintiff William A. Bown had a severe heart attack on February 19, 2011. (*See* Deposition of William Bown at 70:10-13, Ex. "1")). Bown suffered a STEMI – segment elevation myocardial infarction. (*See* Deposition of Graham Wetherly, MD at 8:7-9:12, Ex. "2").[3] His right coronary artery was 100% occluded by a blood clot. (*Id.* at 8:25-9:3). Bown needed immediate surgery to remove the blood clot. (*Id.* at 8:25-9:7).

2.    Bown started having serious chest pain at about 1:00 p.m. on February 19, 2011. (*See* Bown Dep. at 72:2-5). The pain worsened while he was taking a shower. (*Id.* at 72:16-19). Bown felt like a machete had been shoved in his chest. (*Id.* at 80:23-81:6). Bown started screaming out in pain. (*Id.* at 72:16-19).

3.    Bown was an inmate at the Idaho Maximum Security Institute ("IMSI"). (*See* First Amended Complaint at ¶ 1, Dkt. 66). Bown went to a correctional officer and asked to go to medical. (*See* Bown Dep. at 72:19-73:1). Bown was told to wait. (*Id.*). At that time, Bown hit the floor and started rolling around. (*Id.* at 73:2-13). Sweat was pouring out of him. (*Id.*). Bown screamed to the CO to call medical, which he finally did. (*Id.*). Bown flopped around the floor quite a while (*Id.*).

---

[2] Plaintiff concedes summary judgment as to Richins and the correctional defendants.
[3] Dr. Wetherly is the cardiologist who treated Bown in the hospital. (Wetherly Dep. at 6-20:21; 8:7-9:12). "It was obvious that he was having an acute inferior-wall myocardial infarction." (Id. at 8:13-15).

4. Bown was seen in the infirmary by Cassie Richins, a licensed practical nurse. (*See* Richins Dep. at 17:16-18; 39:5-10, Ex. "3"). Bown presented with the classic symptoms of a heart attack. (*See* Deposition of Dennis Levin, MD at 44:20-22, Ex. "4").[4]

5. Richins performed an EKG at 2:17 p.m. (*See* Richins Dep. at 47:3-6; Wetherly Dep. at 21:2-25; EKG strip, Ex. "5"). An EKG print-off shows a wave pattern from the electrical system of the heart. (*See* Wetherly Dep. at 14:16-15:3; EKG strip). The print-off includes a computer reading in words. (*See* Richins Dep. at 22:21-25). However, an EKG is not fully interpreted until a provider actually sees it. (*Id.*). The EKG in this case showed an ST elevation, *i.e.,* STEMI. (*See* Levin Dep. at 49:21-25; Deposition of Karen Barrett at 94:21-95:7; 96:2-3, Ex. "6"). The EKG showed Bown was having an acute heart attack and required immediate hospitalization. (*See* Wetherly Dep. at 22:6-14; 22:20-23:19).

6. Bown was not taken to the hospital for six hours. (*See* Wetherly Dep. at 21:6-21). Richins was not qualified to interpret the EKG.[5] (*See* Richins Dep. at 65:9-11). Richins telephoned Karen Barrett, the physician's assistant on call. (*Id.* at 45:9-19; 47:20-22).[6] Richins reported Bown's symptoms – sweating, nausea, burping and chest pain – to Barrett. (*Id.* at 45:9-22; 47:23-25; 48:13-18). Richins read Barrett the words on the print-out, which stated the EKG was abnormal and indicated an inferior infarct "possibly acute." (*Id.* at 72:22-73:3; EKG strip).

7. Barrett did not ask to review the EKG. (*See* Richins Dep. at 73:16-18). Barrett never looked at the EKG. (*See* Barrett Dep. at 85:5-11). If Barrett had seen the EKG, she would have

---

[4] Dr. Levin is a board certified physician, trained in accrediting prison health care systems, who testified as an expert in *Bown v. Corizon*. (*See* Levin at 12:16-12:25; 13:3-10; 38:3-16). Dr. Levin reviewed medical records and depositions in the case. (*Id.* at 9:14-10:5; 11:4-17).
[5] Richins also could not call for medical transport without a provider's order. (*See* Richins Dep. at 38:1-3). Richins could have lost her job if she did so. (*Id.* at 64:15-19).
[6] No physician or PA was on site because it was a weekend. (*See* Deposition of April Dawson, MD at 31:2-20, Ex. "7").

ordered Bown to be transported immediately.[7]  (*See* Barrett Dep. at 95:2-7; 97:1-8).  When shown the EKG strip in her deposition, Barrett identified the ST elevation.  (*Id.* 95:18-22).

       8.     Barrett also did not request an over read by a provider.  (*See* Barrett Dep. at 97:11-13). Richins Dep. at 73:16-18).  Barrett knew that a heart attack was a potentially life-threatening medical emergency.  (*Id.* at 51:9-13).  Barrett knew Bown had the classic symptoms of a heart attack. (*See Richins* Dep. at 45:9-22; 47:23-25; 48:13-18; Levin Dep. at 44:20-22).  "Cardiac implications" were part of her differential diagnosis.  (*See* Barrett Dep. at 72:1-4).  Barrett knew the EKG computer reading said possible "acute" infarct.  (*See* Richins Dep. at 72:22-73:3).  Barrett should have sought an over read of the EKG urgently.  (*See* Levin Dep. at 46:2-11).  Barrett would expect an over read in an emergent situation if an EKG were abnormal and, most likely, would order one herself.  (*See* Barrett Dep. at 64:11-65:2).

       9.     Several hours after the EKG was performed, a correctional medical specialist (who apparently had some training in the military) looked at the EKG and told Barrett he thought it showed ST elevations.  (*See* Barrett Dep. at 81:13-82:14).  Barrett ordered Bown to be transported to the hospital.  (*Id.* at 82:18-19).

      10.    Since it was a weekend, no one qualified to read an EKG was on site the day of Bown's heart attack. (*See* Dawson Dep. at 31:2-20).

      11.    IMSI did not have a proper system in place for the interpretation of EKGs.  (*See* Levin Dep. at 54:5-12).  There was no mechanism for someone to give an immediate over read.[8] (*Id.*).

---

[7] In her deposition, Barrett denied that she interprets EKGs and stated she is not real comfortable in that area.  (*See* Barrett Dep. at 27:14-22).  Barrett denied an EKG can distinguish between an acute and chronic condition.  (*Id.* at 56:22).  This is clearly incorrect and shows a lack of knowledge.  (*See* Levin Dep. at 18-22).  However, even Barrett would have ordered immediate transport based on the EKG in this case.  (*See* Barrett Dep. at 95:2-7; 97:1-8).

[8] An EKG could be transmitted to a doctor by pressing a button on the machine; however, a reading would not be received until the next day.  (*See* Dawson Dep. at 32:7-17).

12.     Standard procedure was simply to read the computer reading to the provider over the phone. (*See* Barrett Dep. at 85:9-15). There was no way to fax or e-mail the EKG to a provider so he or she could see it. (*See* Barrett Dep. at 23:21-24:2). The provider would have to go to IMSI. (*Id.* at 24:13-16). Barrett was on call for numerous facilities. (*Id.* at 20:21-22; 21:14-20). Barrett was responsible for 5,700 inmates. (*Id.* at 21:21-23). On the day of Bown's heart attack, Barrett was very busy with calls from all over the state and was not really aware of the passage of time. (*See* Def. Ex. "9" at OPS 000067).

13.     Contrary to paragraph 7 of defendant's statement of undisputed facts, a heart attack can be diagnosed based on clinical symptoms and an EKG with a fair degree of certainty much of the time. (*See* Wetherly Dep. at 15:4-11). Again, Barrett would have ordered immediate transport had she seen the EKG. (*See* Barrett Dep. at 95:2-7; 97:1-8).

14.     Also contrary to paragraph 7 of defendant's statement of undisputed facts, Barrett gave no rationale for her failure to order an over read, either in the cited testimony or otherwise. To the contrary, as noted, Barrett testified she would most likely order an over read in an emergent situation where the EKG was abnormal. (*See* Barrett Dep. at 64:24-65:2). With respect to ordering immediate transport, Barrett testified she might make such an order without a chemical profile, as indeed she finally did in this instance. (*Id.* at 65:9-17; 84:15-23).

15.     The delay in treatment resulted in substantial damage to Bown's heart, including the death of heart muscle. (*Id.* at 23:20-24:12; 10:20-13:10). It is unequivocal that the delay caused the heart attack to be larger and had a clear negative impact on his long-term prognosis. (*Id.* at 49:5:10; Levin Dep. at 55:25-56:4).

### III.  ARGUMENT

A.  **BARRETT WAS DELIBERATELY INDIFFERENT TO BOWN'S SERIOUS MEDICAL NEEDS.**

The Eighth Amendment includes the right to adequate medical care in prison, and prison officials or prison medical providers can be held liable if their "acts or omissions [were] sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 106 (1976). A defendant is liable for denying needed medical care if he knows of and disregards an excessive risk to inmate health and safety. *Lolli v. County of Orange,* 351 F.3d 410, 419 (9th Cir. 2003). Under such circumstances, "a person may be liable for neglecting a prison's serious medical needs on the basis of either his action or inaction." *Id.* (quotation omitted). "Although direct evidence of a person's mental state rarely exists, it is not always necessary to prove a person's subjective awareness, as this inquiry is 'subject to demonstration in the usual ways, including inference from circumstantial evidence.'" *Gibson v. County of Washoe,* 290 F3d 1175, 1190 (9th Cir. 2002) (quoting *Farmer v. Brennan,* 511 U.S. 825, 842 (1994)).

Bown had a serious medical need in this case – he was in the middle of a heart attack and needed immediate surgery. (*See* Statement of Material Facts at ¶ 1). Defendants do not deny this.

As to knowledge, Barrett admittedly knew there was a risk Bown was having a heart attack. (*Id.* at ¶ 8). Barrett knew a heart attack was a medical emergency. (*Id.*). Barrett knew Bown had the classic symptoms of a heart attack. (*Id.* at ¶ 8). Barrett knew the EKG computer reading stated an acute heart attack was possible. (*Id.*). Despite this knowledge, and even though an EKG is not fully interpreted unless it is actually seen by a provider, Barrett did not look at the EKG. (*Id.* at ¶¶ 5, 7). Barrett concedes that had she done so, she would have ordered immediate transport to the hospital. (*Id.* at ¶ 7). Indeed, it is undisputed that the EKG showed a heart attack necessitating immediate hospitalization. (*Id.* at ¶¶ 5, 9).

Barrett also did not arrange for any provider to over read the EKG. (*See* Statement of Material Facts at ¶ 8). Barrett concedes that she would expect an over read where, as here, there was an emergent situation and the computer reading was abnormal. (*Id.*). Barrett also concedes she would most likely order an over read under such circumstances. (*Id.*).

The record thus establishes that, by failing to read the EKG or obtain a reading by a provider, Barrett knowingly disregarded an excessive risk that Bown was having a heart attack. Barrett thereby delayed the hospital treatment Bown desperately needed. This is deliberate indifference to a serious medical need. *Lolli,* 351 F.3d at 419 ("Prison officials are deliberately indifferent to a prisoner's serious medical needs when they deny, delay, or intentionally interfere with medical treatment."). It is also undisputed that the delay caused additional damage to Bown's heart. (*Id.* at ¶ 15). The Eighth Amendment was therefore violated in this case.

In arguing the contrary, defendants allege that Barrett undertook a course of treatment that was "medically acceptable" and so harmful delay was permissible as a matter of law. (Dkt. 100-1 at 4). However, her failure to read or obtain a reading of the EKG was not medically acceptable. (*See* Statement of Material Facts at ¶ 8, Levin Dep. at 46:2-11). Further, the only medically acceptable treatment was immediate surgery to remove the blood clot. (*See* Statement of Material Facts at ¶ 1).

Defendants also argue that summary judgment must be granted based on two cases from outside the Ninth Circuit, *Mata v. Saiz,* 427 F.3d 745 (10th Cir. 2005) and *Cairelli v. Vakilian,* 80 Fed. App'x. 979 (6th Cir. 2003). However, neither case applies. In *Mata*, the defendant nurses actually read the EKGs but mistakenly read them as normal. *Mata,* 427 F.3d at 750, 759. This case does not involve a mistaken reading; this case involves a failure to read an EKG at all. (*See* Statement of Material Facts at ¶ 7). Indeed, Barrett would have correctly read the EKG if only she had looked at it. (*Id.*).

*Cairelli,* a 2-1 decision, is also distinguishable. In this case, unlike *Carelli*, the EKG was not simply abnormal, it showed a heart attack requiring immediate hospitalization. (*See* Statement of Material Facts at ¶ 5). Moreover, again, it is undisputed that Barrett would have ordered immediate hospitalization had she looked at the EKG. (*Id.* at ¶ 7).

Based on the foregoing, the record demonstrates that Barrett knowingly disregarded an excessive risk to Bown's health. At the least, the record raises a genuine dispute of fact on that subject. The court should therefore reject defendants' argument to the contrary.

**B.     PLAINTIFF IS ENTITLED TO COMPLETE COURT-ORDERED DISCOVERY REGARDING, AMONG OTHER THINGS, DEFENDANTS' SUPERVISION OF CORIZON.**

In this case, the court has entered an order compelling discovery as follows:

NOW THEREFORE IT IS HEREBY ORDERED, that the motion to compel (docket no. 79) is GRANTED. IDOC must produce the following: Any ESI or other material concerning (1) Bown's medical emergency on February of 2011; (2) the supervision by IDOC of Corizon and communications between the two entities concerning the Bown incident; (3) the two investigations of the Bown incident done by OPS and Rona Siegert; (4) audits by IDOC of Corizon's medical care around the time of the incident; and (5) medical care policies that might bear on Bown's emergency.

IT IS FURTHER ORDERED, that IDOC shall provide a person with expertise in computer searches to meet with Bown's counsel and/or computer expert to agree upon search protocols to ensure that IDOC's ESI is fully searched for the material specified above.

IT IS FURTHER ORDERED, that following that computer search, and depending on its results, Bown may return to this Court to pursue a claim of spoliation.

(Dkt. 95 at 15-16).

As set forth in plaintiff's motion to stay motion for summary judgment, incorporated herein, plaintiff has not yet received the ordered-discovery. Defendants have nevertheless moved for summary judgment arguing that the supervisory defendants cannot be held liable in this case. However, defendants cannot circumvent the court's order by moving for summary judgment. The court-ordered discovery goes to critical issues on plaintiff's claims, including supervision, auditing

9

and policies. Plaintiff is entitled to receive the discovery, and take the depositions he has been waiting to take, before the court rules on these issues. The court should therefore stay the motion pending the completion of discovery.

Plaintiff will nonetheless make some brief observations. IDOC has a duty to provide adequate medical care to inmates. *Estelle v. Gamble,* 429 U.S. at 106. IDOC is not absolved of this duty because it contracted health services out to Corizon. *Ancata v. Prison Health Services, Inc.,* 769 F.2d 700, 705 (11th Cir. 1985). Prison officials remain responsible to supervise the provision of medical care and not to allow policies or customs that contribute to constitutional violations. *Id.*; *see Starr v. Baca,* 652 F.3d 1202, 1205 (9th Cir. 2011); *Larez v. City of Los Angeles,* 946 F.2d 630, 645-46 (9th Cir.1991); *see Barkes v. First Correctional Medical, Inc.,* 766 F.3d 307, 326-27 (3rd Cir. 2014), *rev'd on other grounds, Taylor v. Barkes,* 135 S. Ct. 2042 (2015) ("No reasonable prison administrator could believe that hiring a private contractor to provide a constitutionally required service would allow them to abdicate their constitutional supervisory duties.").

A supervisor is responsible to ensure adequate staffing. *R.G. v. Koller,* 415 F.Supp.2d 1129, 1157 (D. Hawaii 2006); *see Gibson v. County of Washoe,* 290 F.3d 1175, 1187 (9th Cir. 2002) ("In order to comply with their duty not to engage in acts evidencing deliberate indifference to inmates' medical and psychiatric needs, jails must provide medical staff who are competent to deal with prisoners' problems.") (internal quotation omitted). And supervisory officials may be liable for their own acts or omissions, including supervising with deliberate indifference toward the possibility that deficient performance of a task may contribute to a civil rights violation. *Sanchez v. Pereira-Castillo,* 590 F.3d 31, 49 (1st Cir.2009), *cited in Starr,* 652 F.3d at 1207. These constitutional duties are established beyond debate. *Ashcroft v. al-Kidd,* 131 S. Ct. 2074, 2083 (2011).

As the Ninth Circuit Court of Appeals has held:

> A showing that a supervisor acted, or failed to act, in a manner that was deliberately indifferent to an inmate's Eighth Amendment rights is sufficient to demonstrate the involvement— and the liability— of that supervisor.
>
> \*     \*     \*
>
> A defendant may be held liable as a supervisor under § 1983 "if there exists either (1) his or her personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation." *Hansen v. Black,* 885 F.2d 642, 646 (9th Cir. 1989). "[A] plaintiff must show the supervisor breached a duty to plaintiff which was the proximate cause of the injury. The law clearly allows actions against supervisors under section 1983 as long as a sufficient causal connection is present and the plaintiff was deprived under color of law of a federally secured right." *Redman,* 942 F.2d at 1447 (internal quotation marks omitted).
>
> "The requisite causal connection can be established ... by setting in motion a series of acts by others," *id.* (alteration in original; internal quotation marks omitted), or by "knowingly refus[ing] to terminate a series of acts by others, which [the supervisor] knew or reasonably should have known would cause others to inflict a constitutional injury," *Dubner v. City & Cnty. of San Francisco,* 266 F.3d 959, 968 (9th Cir.2001). "A supervisor can be liable in his individual capacity for his own culpable action or inaction in the training, supervision, or control of his subordinates; for his acquiescence in the constitutional deprivation; or for conduct that showed a reckless or callous indifference to the rights of others." *Watkins v. City of Oakland,* 145 F.3d 1087, 1093 (9th Cir. 1998) (internal alteration and quotation marks omitted).

*Starr,* 652 F.3d at 1206-07, 1207-08.

Systemic deficiencies contributed to the constitutional violation in this case. For example, IMSI had no one on site who was qualified to read an EKG. (*See* Statement of Material Facts at ¶ 10). IMSI did not have the capability to fax or e-mail an EKG to a remote provider, such as the PA on call, so that provider could read it. (*Id.* at ¶ 11, 12). The PA on call was responsible for numerous facilities, which housed 5,700 inmates. (*Id.* at ¶ 12).

Plaintiff may of course identify other deficiencies in the course of discovery. However, the foregoing certainly suggest a failure of supervision, auditing and proper policies and procedures in this case. The court should stay the summary judgment motion pending the completion of discovery.

11

## IV.  CONCLUSION

The court should reject the argument that there was no underlying constitutional violation in this case. The court should also stay the summary judgment motion until plaintiff has received court-ordered discovery and taken additional depositions.

DATED this 19th day of April, 2016.

_____
Timothy W. Miller
MILLER LAW OFFICE
119 South Washington
Casper, WY  82601
Phone  (307) 472-3060
Fax     (307) 472-3061

Co-Counsel for Plaintiff

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 19th day of April, 2016, the foregoing document was served to all parties as follows:

| | |
|---|---|
| Phillip J. Collaer, ISB #3447<br>M. Blake Hill<br>ANDERSON, JULIAN & HULL, LLP<br>C. W. Moore Plaza<br>250 S. Fifth St, Suite 700<br>P. O. Box 7426<br>Boise, ID 83707<br>Telephone: 208.344.5800<br><br>*Counsel for Defendants Brent Reinke, Rona Siegert, Randy E. Blades, Jimmie H. Crosby, Daniel Mettie, Becky A. Blake, Ronald D. Pixler and Timothy J. Richardson* | ☐ U. S. P. S. (hard copy)<br>☐ Telefax 208.344.5510<br>☐ Hand deliver<br>x ECF |

                                                          /*ss*/
                                                  K. A. Bachert, CP