IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| WILLIAM A. BOWN,<br><br>        Plaintiff,<br><br>vs.<br><br>BRENT D. REINKE; RONA SIEGERT; RANDY E. BLADES; JIMMIE H. CROSBY; DANIEL METTIE; BECKY A. BLAKE; RONALD D. PIXLER; TIMOTHY J. RICHARDSON; CORIZON, INC., fka CORRECTIONAL MEDICAL SERVICES, INC., a Missouri corporation; KAREN B. BARRETT, PA; APRIL DAWSON, MD; CASSIE RICHINS, LPN; and JOHN and JANE DOES 1-10,<br><br>        Defendants. | Case No. 1:12-cv-00262-BLW<br><br>**MEMORANDUM DECISION AND ORDER** |

## INTRODUCTION

The Court has before it defendants' motion for summary judgment and motion for protective order, and plaintiff's motion to stay proceedings and for more discovery. The Court heard oral argument on the motion for summary judgment on June 28, 2016, and took the motions under advisement. For the reasons explained below, the Court will (1) deny the defendants' motions and (2) grant in part the plaintiff's motion, allowing more discovery but finding no need to stay these proceedings given the denial of the motion for summary judgment.

**Memorandum Decision & Order – page 1**

## FACTUAL BACKGROUND

On a Saturday afternoon, plaintiff William Bown, an inmate at the Idaho Maximum Security Institution (IMSI), complained to guards about a severe pain in his left arm and a burning pain in his chest. An EKG showed he was having a heart attack, but the failure of the jail to have anyone available during the weekend to interpret the EKG meant that Bown was not transported to a hospital for hours. This delay, Bown claims, resulted in permanent damage to his heart. He filed this lawsuit under § 1983 for the violation of his Eighth Amendment rights.

Bown started having chest pains at about 1:00 p.m. on February 19, 2011. As the pain intensified, he attempted to get help. He recalls that he "started screaming" and that "[s]weat was just pouring out of me." *See Bown Deposition (Dkt. No. 105-1) at p. 73.* His pain was an 8 on a scale of 1 to 10, with 10 being the most intense pain.

He was taken to the prison's medical unit where he was seen by Cassie Richins, a licensed practical nurse. She telephoned Karen Barrett, the physician's assistant on call, and described Bown's symptoms of chest pain, sweating, and nausea. *See Richins Deposition (Dkt. No. 105-3) at p. 65.* Barrett recalls directing Richins to immediately order an EKG and a blood enzyme analysis. *See Barrett Deposition, (Dkt. No. 100-14) at p. 74.*

Richins performed an EKG at 2:17 p.m. The EKG consists of a graphic display of the heart's electrical activity and also includes a computer-generated statement summarizing in printed words what is being displayed graphically. *See EKG (Dkt. No. 105-5).*

**Memorandum Decision & Order – page 2**

Richins was not qualified to interpret the EKG's graphic display or to understand the computer-generated summary. *See Richins Deposition (Dkt. No. 105-3)* at p. 65. And Barrett was not available to read the EKG itself – she was not physically present at the jail, and she testified that there was no way for Richins to transmit the EKG to her that day. *See Barrett Deposition, supra,* at 97 ("there was no way I could see the EKG"). It was not unusual for the prison to lack qualified medical personnel on-site during the weekends. Dr. April Dawson, Corizon's supervising physician, testified that it was common on weekends to have no medical provider on site at the jail. *See Dawson Deposition (Dkt. No. 105-7)* at pp. 30-32.

But Richins could telephone Barrett, and did so, reading her the computer-generated summary on the EKG print-out that stated as follows: "Sinus bradycardia. Interior infarct. MS-Qwave and/or ST abnormality in second AVF. Possible acute. Marked ST depression. Possible subendocardial injury. ST depression. Abnormal EKG." *Id.*

Barrett testified that interpreting EKGs is "just not an area that I'm real comfortable in." *See Barrett Deposition, supra,* at p. 27. When asked how often she interprets EKGs, Barrett answered "I don't." *Id.* Instead, she testified that she could, in theory, request an "over-read" – a doctor's opinion – but had never actually made such a request herself. *Id.* at pp. 25, 27.

At any rate, Barrett never saw – or requested to see – the EKG. If Barrett could have seen the EKG, she would have ordered Bown transported to the hospital immediately. Barrett knew enough to discern "ST elevations" on an EKG's graphic

**Memorandum Decision & Order – page 3**

display, and to know that a patient with "ST elevations" should be transported immediately to the hospital for emergency treatment. *Id.* at 82, 95-97. During her deposition, Barrett was shown the EKG taken by nurse Richins – it was the first time Barrett had seen it. *Id.* at p. 95, 97. Barrett quickly spotted the ST elevations and testified that if she had seen the EKG when treating Bown, she probably would have ordered him transported immediately, but also testified that "[t]here was no way I could see the EKG." *Id.* at p. 97. In other words, if the prison's system simply had a way for Richins to transmit the EKG to Barrett, Bown would have been transported immediately.

But that was not the case. The written computer-generated summary of the EKG that nurse Richins read to Barrett over the phone did not mention ST elevations – they were apparent only upon viewing the EKG itself. *See Levin Deposition (Dkt. No. 105-4)* at p. 49. After hearing nurse Richins read the summary over the phone, Barrett asked about blood enzyme lab results because "that was going to be my deciding factor," and also asked about Bown's condition. *Id.* at p. 77. Richins said the blood test results had not yet come in, and that Bown was sleeping. *Id.* Hearing that Bown was sleeping "helped precipitate" Barrett's decision to wait for the blood test results before transporting Bown because in her mind, Bown "did not appear to be in any distress at that point . . . ." *Id.* at pp. 77, 80.

But in fact Bown was in distress – he was having a heart attack. A blood clot had blocked 100% of the blood flow in his right coronary artery. *See Dr. Wetherly Deposition (Dkt. No. 105-2)* at pp. 8-9. The EKG taken by nurse Richins showed clearly that Bown was having a heart attack, according to the treating cardiologist Dr. Graham

**Memorandum Decision & Order – page 4**

Wetherly, who reviewed the EKG during his deposition. *Id.* at p. 22 ("If this [Bown's EKG] had been faxed to me as a question, then I would have told the person who faxed it to me that their patient was having an acute heart attack").

But Barrett decided to wait before ordering Bown to be transported to the hospital because (1) Bown was sleeping and did not appear to be under any distress, and (2) the blood test results – which were crucial to Barratt's analysis of whether Bown was suffering a heart attack – would be done, she estimated, "within an hour or two max." *See Barrett Deposition, supra,* at p. 81. Richins had to draw Bown's blood and then transport it herself to the hospital for testing, a drive that took 30 minutes or so. The test results would not be returned to Richins for "a couple of hours," even if she had requested – as she did here – that the testing be done "stat" or immediately. *See Barratt Deposition, supra,* at pp. 45-46.

But there was a delay at the hospital that was conducting the blood testing, and more hours passed. Nurse Richins finished her shift and was replaced by Chance Luster. Luster told Barrett he saw ST elevations on Bown's EKG, and that convinced Barrett to stop waiting for the blood tests and transport Bown to the hospital immediately. *Id.* at p. 82. Almost five hours had now passed since Bown had been brought into the medical unit. *See Dr. Wetherly Deposition, supra,* at p. 24.

At the hospital, Dr. Wetherly removed the blood clot and restored the flow of blood. But in the five hours of delay between the first EKG done by nurse Richins and the EKG done immediately upon Bown's arrival at the hospital, there was "a substantial

amount of damage" to Bown's heart, according to Dr. Wetherly. *See Dr. Wetherly Deposition, supra,* at p. 24.

## LITIGATION BACKGROUND

Bown filed this action under § 1983 claiming that his Eighth Amendment rights had been violated by the delay in treatment for his heart attack. He sued (1) Brent Reinke, Director of IDOC; (2) Rona Siegert, Health Service Director; (3) Randy Blades, Warden (4) Jimmie Crosby, Deputy Warden; (5) Daniel Mettie, Corrections Officer; (6) Becky Blake, Corrections Officer (7) Ronald Pixler, Corrections Officer; (8) Timothy Richardson, Assistant Shift Commander; (9) Corizon Inc.; (10) Karen Barrett, physician's assistant; (11) April Dawson, and (12) Cassie Richins, LPN.

Bown later settled with Corizon Inc. (the provider of medical services at the prison under a contract with the Idaho Department of Corrections) and the medical team (Barrett, Dr. Dawson, and Richins). After the remaining defendants filed the motion for summary judgment now before the Court, Bown agreed to the dismissal of the Corrections Officers (Mettie, Blake, Pixler, and Richardson). That leaves the administrative defendants as the only remaining defendants – Reinke (Director of IDOC), Siegert (Health Services Director), Blades (Warden), and Crosby (Deputy Warden).

## ANALYSIS

Bown has a constitutional right under the Eighth Amendment "to not have officials remain deliberately indifferent to [his] serious medical needs." *Gibson v. County of Washoe, Nev.,* 290 F.3d 1175, 1187 (9th Cir. 2002). To satisfy this constitutional right, "jails must provide medical staff who are competent to deal with

**Memorandum Decision & Order – page 6**

prisoners' problems." *Id.*  Bown alleges that the defendants failed to provide competent medical staff to provide an immediate interpretation of EKGs on weekends, and that this failure was the cause of his significant injuries.

The defendants counter in their summary judgment motion that Bown is really complaining about a missed diagnosis, a complaint that might constitute malpractice but is not a constitutional violation.  The defendants cite well-established case law that the Eighth Amendment is not violated by medical malpractice, or even gross negligence.  *See Estelle v. Gamble,* 429 U.S. 97, 106 (1976).

To determine whether this case hinges on a missed diagnosis or something else, the Court must view the evidence in a light most favorable to Bown.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986).  This means that the evidence submitted by Bown "is to be believed, and all justifiable inferences are to be drawn in his favor."  *Id.*

Viewed in this light, the evidence tends to show that Bown's injuries were caused by a systemic failure, not a missed diagnosis.  The systemic failure was in (1) having no qualified person available during weekends to immediately view and interpret EKGs, and (2) having no transport protocol in place taking into account the lack of expertise available during weekends.

The issue is whether a reasonable juror could find that these systemic failures to provide medical care satisfy the deliberate indifference test that Bown must prove to prevail on his § 1983 claim.  That test has two prongs.  Under the first, Bown must show that the failure to provide immediate EKG interpretation "could result in further significant injury or the unnecessary and wanton infliction of pain."  *Jett v. Penner*, 439

**Memorandum Decision & Order – page 7**

F.3d 1091, 1096 (9th Cir. 2006).  Under the second prong, Bown must show that the prison administrators "knew of and disregarded the substantial risk of harm and failed to act despite this knowledge."  *Lemire v. Cal. Dept. of Corr. & Rehab.,* 726 F.3d 1062, 1074 (9th Cir. 2013).  This second prong is a subjective test, and "evidence of obviousness may present a disputed fact to defeat summary judgment."  *Harrington v. Scribner,* 785 F.3d 1299, 1304 (9th Cir. 2015).

There is no question that the failure to provide immediate EKG interpretation could result in significant injury.  The testimony from two experts, Drs. Levin and Wetherly, demonstrates that (1) an EKG is the first test ordered when a patient presents with classical physical symptoms like Bown did here; (2) the results of the EKG are crucial in diagnosing a heart attack, and (3) the EKG must be administered and interpreted immediately because quick treatment can save the heart muscle from being destroyed.  *See Wetherly Deposition, supra,* at pp. 14-18; *Levin Deposition, supra,* at p. 54.  Time is of the essence because every minute that the blood clot restricts the flow of blood to the heart results in lost heart muscle that cannot be recovered.  *Id.*

The second prong requires Bown to prove that the prison administrators knew of this substantial risk but failed to provide a means for immediate EKG interpretation (or failed to provide a transport protocol that took into account the lack of expertise).  Although direct evidence of a person's mental state rarely exists "it is not always necessary to prove a person's subjective awareness, as this inquiry is subject to demonstration in the usual ways, including inference from circumstantial evidence."

**Memorandum Decision & Order – page 8**

*Gibson,* 290 F.3d at 1190.  As discussed above, "evidence of obviousness may present a disputed fact to defeat summary judgment." *Harrington,* 785 F.3d at 1304.

The substantial risk of injury or death caused by a lack of immediate EKG interpretation was obvious to the prison administrator defendants.  It is obvious that inmates have heart attacks on weekends and will need the immediate evaluation that can be obtained with an EKG.  It is obvious that an inmate having a heart attack cannot wait for hours, or a day, to obtain an EKG interpretation from a cardiologist.  While blood testing can confirm an EKG reading, it is undisputed in this record that it would take hours to obtain blood test results.  It is obvious that an inmate suffering a heart attack cannot wait for hours while his blood is being tested.  In other words, it was obvious to prison administrators that blood testing could not substitute for the immediacy of an EKG reading.  Finally, anticipating this lack of expertise on weekends, it is obvious that a transport protocol must be in place to ensure quick transport to a hospital when certain classic signs of a heart attack are present, taking into account the security needs of the prison.

Despite this obvious risk of substantial injury or death, the prison administrator defendants maintained a system that provided no opportunity on weekends for an immediate EKG interpretation.  Defendants argue, however, that they anticipated this problem and provided a system to get quick interpretations (called "over-reads") of an EKG by a cardiologist:  A nurse could press a button on the EKG machine and transmit the EKG to a cardiologist for interpretation.  *See Dawson Deposition (Dkt. No. 105-7)* at pp. 30-32.  Defendants argue that this system is sufficient under the Eighth Amendment,

**Memorandum Decision & Order – page 9**

and that they cannot be held liable for the failure of the medical staff to use the system as intended.

But there are significant questions of fact over whether this system mitigated any risk whatsoever. While the defendants point to Barrett's testimony that an over-read might take "30 minutes to a couple of hours," *see Barrett Deposition, supra*, at p. 63, it is obvious that an inmate having a heart attack might suffer substantial harm if he has to wait a "couple of hours."

Moreover, this time estimate is contradicted by Dr. Dawson and Barrett herself. Dr. Dawson testified that the cardiologist's interpretation "is not something that comes back that day generally. It's something that is going to come back the next day." *Id.* Barrett testified at another portion of her deposition that she (1) had never requested an over-read, and (2) did not know how long it would take to obtain an over-read. *Id*. at p. 25. This contradictory testimony creates issues of fact.

Furthermore, the Court was provided with no protocols concerning the use by prison medical staff of this button feature on the EKG machine. Most importantly, did the system protocols require the medical staff to press the button in every case? Did Richins or Barratt violate prison policies by not transmitting the EKG to a cardiologist? Nothing in the record allows the Court to answer these questions as a matter of law.

Moreover, there is a lack of evidence defining this "system." Supposedly, pressing the button transmits the EKG immediately to a certain cardiologist. Who is that? Does the prison medical staff just wait for the cardiologist to respond? Or does the prison staff call the cardiologist's office to check on his/her availability? What if the

**Memorandum Decision & Order – page 10**

cardiologist is not available?  Does the lack of qualified evaluation trigger more immediate action to transport the inmate to the hospital?  Under what circumstances?  Without any evidence on the prison's protocols governing use of the button feature on the EKG machine, the Court cannot adopt defendants' argument that, as a matter of law, the prison had a system in place for emergency treatment that complies with the Eighth Amendment.

In conclusion, the prison administrators' inaction in the face of such an obvious threat creates an issue of fact on the subjective prong of the deliberate indifference test and warrants denial of the motion for summary judgment.  *Gibson,* 290 F.3d at 1189-91 (reversing grant of summary judgment because reasonable juror could find that jail's failure to provide urgent medical evaluation for arrestee constitutes deliberate indifference).

The defendants argue, however, that they are entitled to qualified immunity as a matter of law.  The Court disagrees.  It was well-established at the time of this incident that "jails must provide medical staff who are competent to deal with prisoners' problems."  *Id.* at 1189.  It was also well-established that inaction by prison administrators in the face of life-threatening and obvious risks to inmates violates their Eighth Amendment rights.  *Farmer v. Brennan*, 511 U.S. 825, 842 (1994).  At the time of Bown's heart attack, these rights were clearly established and entitled Bown to qualified medical emergency treatment for his heart attack.  As set forth above, there are substantial questions of fact as to whether the prison administrator defendants were

deliberately indifferent to Bown's Eighth Amendment rights. Accordingly, defendants' summary judgment motion on qualified immunity is denied.

**Motion to Stay and for Discovery**

Bown has moved for a stay of the summary judgment proceedings so that he can obtain certain discovery that defendants have refused to produce. In prior decisions, the Court awarded sanctions of $43,499.60 against defense counsel Phillip Collaer and Blake Hill on the ground that they intentionally made discovery difficult for plaintiffs. The Court also ordered them to produce certain discovery.

At oral argument, Bown asserted that defendants have continued to stonewall their discovery requests seeking information to explain why there was no qualified person at the prison on weekends to read EKGs, and why Barrett was not at the prison during her weekend shift. This evidence could be highly relevant to counter any argument from the defendants that (1) Barrett violated prison policy in being off-site that day; (2) if Barrett had been on-site she would have been able to read the EKG and would have transported Bown immediately to the hospital; and (3) Barrett's violation of prison policy – rather than a flawed prison system that failed to provide immediate EKG interpretation on weekends – was the cause of Bown's damage.

If defendants had made this argument in the summary judgment proceedings, the Court would have granted the motion to stay these proceedings until Bown could obtain this discovery. But defendants did not pursue this line of argument, and so there is no need to stay these proceedings. Nevertheless, Bown remains entitled to this evidence

because it is relevant not only to defenses the defendants might raise at some later point, but also because it is relevant to Bown's own claims.

Accordingly, the Court will grant this motion in part and deny it in part. The Court will grant the motion to the extent it seeks to expand the discovery deadline to allow for the depositions of the defendant prison administrators and to allow for further discovery on the policy and practices generally regarding medical evaluations on weekends at the prison and specifically regarding Barrett's presence during her weekend shifts.[1] As discussed, the Court will deny that portion of the motion seeking to stay these summary judgment proceedings.

The Court would note that although there is no pending motion for sanctions, the Court would entertain such a motion if discovery stonewalling has occurred or continues.

**Motion for Protective Order**

The defendants have moved for a protective order to shield them from Bown's discovery requests discussed above. Pursuant to the discussion above, the defendants' motion is specious and will be denied.

**ORDER**

In accordance with the Memorandum Decision set forth above,

NOW THEREFORE IT IS HEREBY ORDERED, that the motion for summary judgment (docket no. 100) and the motion for protective order (docket no. 108) are DENIED.

---

[1] Until discovery is closed, the Court refuses to grant summary judgment on any issue, including the claim for prospective injunctive relief or the claim challenging audits.

**Memorandum Decision & Order – page 13**

IT IS FURTHER ORDERED, that the motion to stay or for additional discovery (docket no. 102) is GRANTED IN PART AND DENIED IN PART.  The motion to stay is denied but the motion for discovery is granted, as set forth in the decision above.

DATED: July 5, 2016

_____
B. Lynn Winmill
Chief Judge
United States District Court